**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
|     JOHN N. IRWIN, | : | |
|         Debtor. | : | Bky. No. 10-14407 ELF |
| | : | |
| GEORGE L. MILLER, as Liquidating Agent of the Estate of John N. Irwin, | : | |
| | : | |
|         Plaintiff, | : | |
| | : | |
|     v. | : | Adv. No. 12-0383 ELF |
| ANTHONY JANNETTA, | : | |
|         Defendant. | : | |

# O P I N I O N

## I.  INTRODUCTION

In this adversary proceeding, the liquidating agent appointed pursuant to debtor's confirmed chapter 11 plan seeks to recover monies that the debtor advanced to the defendant roughly twenty (20) years before the commencement of this bankruptcy case.  As one might expect, the central issue in the litigation is the applicability of the affirmative defense of the statute of limitations.

As explained more fully below, I conclude that the statute of limitations bars the liquidating agent's recovery.  Accordingly, judgment will be entered in favor of the defendant and against the liquidating agent.

## II. PROCEDURAL HISTORY

Debtor John N. Irwin ("the Debtor") filed a voluntary chapter 11 case on May 27, 2010. (Bky No. 10-14407, Doc. #1). This court confirmed the Debtor's Second Amended Chapter 11 Plan of Reorganization ("the Plan") (id., Doc. #282) on January 12, 2012. (id., Doc. #296). The Plan provides for the liquidation of all of the Debtor's non-exempt assets and the appointment of a liquidating agent. (Plan ¶¶1.8, 7.1(a). The liquidating agent is authorized to sell all of the Debtor's non-exempt assets and pursue all avoidance and other causes of action. (Plan ¶7.1(a), (b)). Pursuant to the Plan, George L. Miller ("Miller") was appointed as the liquidating agent of the Debtor's estate.

Miller filed an adversary complaint against Defendant Anthony Jannetta ("Jannetta") on May 11, 2012 and an amended complaint ("the Amended Complaint") on July 16, 2012.[1] In the

---

[1] This court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §1334(b) (providing for original, but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11).

After confirmation of a chapter 11 plan, the exercise of subject matter jurisdiction under §1334(b) is limited to matters that "affect an integral aspect of the bankruptcy process," i.e., to matters that have a "close nexus to the bankruptcy plan or proceeding." In re Seven Fields Dev. Corp., 505 F.3d 237, 258 (3d Cir. 2007) (quoting In re Resorts Int'l, Inc., 372 F.3d 154, 167 (3d Cir. 2004)). Specifically, the matter must affect "the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement." Resorts, 372 F.3d at 168-69. The requisite close nexus can exist in various types of controversies. See In re Transcontinental Refrigerated Lines, Inc., 494 B.R. 816, 821 (Bankr. M.D. Pa. 2013) (giving examples). In the context of an adversary proceeding to collect a pre-petition claim of the bankruptcy estate that is filed post-confirmation, the mere fact the outcome of the proceeding may result in additional assets to distribute to creditors, by itself, does not create a close nexus to the plan or the bankruptcy case. E.g., In re Insilco Technologies, Inc., 330 B.R. 512, 524 (Bankr. D. Del. 2005) (citing Resorts, 372 F.3d at 170). Rather, for a sufficiently close nexus to exist, the plan must describe the action over which the court had pre-confirmation jurisdiction and expressly provide for the retention of bankruptcy court jurisdiction to liquidate the claim. E.g., In re BWI Liquidating Corp., 437 B.R. 160, 165 (Bankr. D. Del. 2010).

Based on my review of the bankruptcy schedules (Schedule B-16) (Bky. No. 10-14407, Doc. #3), Article 6.1(b), 6.1(c), 9.1 and 11.1 of the Second Amended Disclosure Statement (Bky. No. 10-14407, Doc. #283), and Article 7.1(a), 7.1(b), 7.1(d) and 11.1 of the Plan, I conclude that a the standards
(continued...)

Amended Complaint, Miller alleged that, prior to the commencement of the bankruptcy case, the Debtor advanced Jannetta $130,000.00 and that Jannetta was obliged to return the money pursuant to 11 U.S.C. §§542(a), 542(b) and the doctrine of unjust enrichment. Jannetta filed an Answer to the Amended Complaint ("the Answer") on November 16, 2012, denying the allegations in the Amended Complaint and asserting several affirmative defenses.[2]

At trial, which was held and concluded on October 7, 2013, Jannetta was granted leave to amend his Answer to permit him to raise the statute of limitations as an affirmative defense. After the conclusion of the trial, the parties filed post-trial briefs, the last of which was filed on December 16, 2013. (See Doc. #'s 51, 53).

### III. FINDINGS OF FACT

The Debtor and Jannetta became acquainted when Jannetta leased office space from the Debtor in 1985. (N.T. 17-18). In the ensuing years, the Debtor and Jannetta were involved in several mutual business investments. (Id. 18-19). Jannetta primarily laid the groundwork for the investment opportunities and raised capital. (Id. 18-19, 81-82). The Debtor performed the accounting work for the start-up and operation of the businesses. (Id. 19). In several instances, Jannetta received equity in exchange for finding investors. (Id. 94-95). Jannetta would

---

[1](...continued)
stated above are satisfied, a close nexus exists between this adversary proceeding and the Plan and therefore, that this court has subject matter jurisdiction over the proceeding.

[2]     Prominent among those defenses is Jannetta's assertion that Miller's recovery is subject to his setoff rights. See 11 U.S.C. §553. Because Miller is not entitled to recover on other grounds, it is not necessary to consider Jannetta's setoff defense.

contribute part of his interest in the company to the Debtor for the accounting and financial work provided by the Debtor. (Id. 83, 95).

**The Advances**

Prior to the petition date, the Debtor advanced $126,925.00, $32,095.00 and $3,612.00 to or on behalf of Jannetta (collectively, "the Advances"). (N.T. 39). The total amount of pre-petition advances to Jannetta, including "the Companies Loan" (described just below), was approximately $162,632.00. (Id. 39). On Schedule B, the Debtor listed $130,000.00 as the amount of an account receivable due from Jannetta.[3] (Ex. P-1).

The more sizable advance, the $126,925.00, was derived from investments in two (2) companies based in New Jersey – Advacote and Diversified Products ("DPI") (collectively, "the Companies"). (N.T. 21-22). The Debtor and Jannetta were among several other shareholders in the Companies. (Id. 22-23).

From approximately 1989 to 1993, the Debtor advanced money to the Companies on Jannetta's behalf as capital contributions ("the Companies Loan"). (Id. 20, 22). The Debtor kept a ledger ("the Ledger") detailing the money that he advanced to or for Jannetta on the Companies Loan.[4] According to the Debtor's records, he advanced $126,925.00, either to the Companies

---

[3] The Debtor testified that he "rounded down" the amount that Jannetta owed, from $162,632.00 to $130,000.00. (N.T. 39-40). The Debtor offered no other explanation for the basis of the approximately $32,000.00 reduction.

[4] The accuracy of the amounts recorded in the Ledger was the subject of considerable debate at trial. In general, the Debtor's testimony regarding the Ledger was vague, contradictory and unconvincing. At one point in his testimony, the Debtor stated he recorded the amounts contemporaneously with each advance. However, when questioned why the amounts for the second half
(continued...)

directly, or to Jannetta, who then forwarded the funds to the Companies. (Ex. P-2; N.T. 26-27).

The Companies Loan was an oral agreement between the Debtor and Jannetta, the terms of which were never reduced to a written contract. (N.T. 20-21). According to the parties, the Companies Loan did not have a specific due date. However, the Debtor and Jannetta agreed that Jannetta would satisfy the obligation when the Companies became profitable. (N.T. 31).

In 1994, after the Companies' operations were abandoned and the Debtor took a loss on the investment for tax purposes, the parties agreed that the Companies Loan would be repaid when Jannetta's "ship comes in." (Id. 31-32). The Debtor understood that to mean that Jannetta would repay the Companies Loan when he made a profit from other investments. (Id. 32).

The smaller two (2) advances of $32,095.00 and $3,612.00 were not related to the Companies. (Id. 56). The Debtor identified the $32,095.00 advance as "other amounts that were advanced over the years" to Jannetta.[5] (Id. 39). The $3,612.00 advance was for "individual items" that the Debtor on Jannetta's behalf. (Id. 56).

## The October 20, 2010 E-Mail

The Debtor did not demand payment from Jannetta on the Companies Loan prior to 2010. (Id. 32, 60). In late 2010 (after filing this bankruptcy case), the Debtor told Jannetta in person

---

[4](...continued)
of 1991, 1992 and 1993 were annual totals rather than monthly amounts, the Debtor was unable to recall the reason for the change, nor could he produce an additional schedule on which he believed the monthly amounts had been recorded. (N.T. at 42-44). Further, the Debtor could not explain the meaning of various numerical entries on the Ledger. (Id. at 55-57).

[5]   No further details were provided regarding the purpose of the advances or repayment terms.

that Jannetta owed him $130,000.00 on account of the Advances. Jannetta disputed that he was liable for the Advances, but believed that he could negotiate some resolution of the dispute with the Debtor. (Id. 85).

Shortly after their conversation, on October 20, 2010, Jannetta sent the Debtor an electronic communication, inquiring about the amount of the Advances. (Ex. P-3). The subject of the e-mail was "Money owed -- Jannetta." (Id.). Jannetta wrote:

> Talked to the receiver's lawyer this morning.[6] They want to talk to me about the money I owe you when I am deposed. I will be seeing him sometime by year end and go thru [sic] the deposition drill.
>
> Because of that, I need to know my obligation. You had told me a short time ago, when we spoke about my leaving the office, that it was (I think) somewhere around 70K. As you know, I hope to pay you when Yaupon gets sold.
>
> Please get back to me and let me know the amount.

(Id.).[7]

## IV.  LEGAL STANDARDS

### A.  Turnover pursuant to 11 U.S.C. §542

Generally speaking, turnover actions, pursuant to 11 U.S.C. §542, are considered "a

---

[6] Jannetta was referring to a federal court appointed receiver who represented the interests of the victims of a Ponzi scheme operated by Joseph Forte, an individual for whom the Debtor performed accounting services and with whom the Debtor had a business relationship. (See Debtor's Second Amended Disclosure Statement at 6) (Bky. No. 10-14407, Doc. # 283)). The receiver was the largest creditor in the Debtor's bankruptcy case.

[7] The Debtor testified that "Yaupon" was a business in which he and Jannetta had invested and that was being sold. The Debtor and Jannetta were expecting to receive a large sum for their respective interests in the business. (N.T. 92).

remedy available to debtors to obtain what is acknowledged to be property of the bankruptcy estate." In re Asousa P'ship, 264 B.R. 376, 384 (Bankr. E.D. Pa. 2001) (citing In re Rosenzweig, 245 B.R. 836, 839-40 (Bankr. N.D. Ill. 2000)). The turnover provision of the Bankruptcy Code is designed to facilitate administration of the estate and allow the Debtor to obtain property necessary for survival. In re Charter Co., 913 F.2d 1575, 1579 (11th Cir. 1990); In re Chick Smith Ford, Inc., 46 B.R. 515, 518 (Bankr. M.D. Fla. 1985).

Two (2) subsections of §542 are at issue in this proceeding: subsections (a) and (b).

Section 542(a) provides that:

> an entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 . . . shall deliver to the trustee, and account for such property . . . unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. §542(a).

Section 542(a) is limited to property that the trustee may use, sell, or lease under §363. The elements of a §542(a) claim are:

> (1) the defendant is in possession, custody, or control;
>
> (2) of property that may be used, sold, or leased under §363;
>
> (3) during the case; and
>
> (4) the property is not of inconsequential value or benefit to the estate.

In re DBSI, Inc., 468 B.R. 663, 669 (Bankr. D. Del. 2011).

Section 542(b) provides that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to . . . the trustee." 11 U.S.C. §542(b). A debt is matured, payable on demand, or payable on order if it is "presently

payable," where payment is not subject to any condition precedent. In re Kids World of Am., Inc., 349 B.R. 152, 163 (Bankr. W.D. Ky. 2006) (citing In re Gordons Transports, Inc., 51 B.R. 633 (Bankr. W.D. Tenn. 1985)); In re Cambridge Capital, LLC, 331 B.R. 47, 57 (Bankr. E.D.N.Y. 2005).[8]

Also relevant to the determination of Miller's claim against Jannetta is §541, which defines "property of the estate." It provides that the estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. §541(a). Property rights that become part of the bankruptcy estate under §541 are determined by applicable nonbankruptcy law and, unless overridden by specific provisions of the Bankruptcy Code, the debtor's property rights are limited by any restrictions arising under state law. E.g., In re Stewart, 368 B.R. 445, 450 (Bankr. E.D. Pa. 2007) (citing Butner v. United States, 440 U.S. 48, 55 (1978), and In re Brannon, 476 F.3d 170, 176 (3d Cir. 2007)); see also Laddin v. Edwards, 2005 WL 6076939, at *5-6 (N.D. Ga. Feb. 16, 2005). Consequently, to the extent that a statute of limitations defense would defeat the Debtor's claim against Jannetta in a non-bankruptcy court proceeding, that defense is available to Jannetta in Miller's adversary proceeding in this court.

---

[8] I note that Jannetta argues that §542(b) is unavailable to Miller as a matter of law because the Companies Loan is unliquidated and subject to a bona fide dispute. Some courts agree, reasoning that turnover is not intended to replace a common law breach of contract action and cannot be invoked to determine the outcome of a bona fide contract dispute. See In re Hechinger Investment Co. of Delaware, Inc., 282 B.R. 149, 162 (Bankr. D. Del. 2002) ("[Turnover] is not a remedy available to recover claimed debts which remain unliquidated and/or in dispute." (quoting Asousa, 264 B.R. at 384)); see also In re Pennsylvania Gear Corp., 2008 WL 2370169, *4 (Bankr. E.D. Pa. Apr. 22, 2008); Asousa, 264 B.R. at 385 (citing In re FLR Company, Inc., 58 B.R. 632, 634 (Bankr. W.D. Pa. 1985)). Other courts adhere strictly to the plain language of §542(b) finding that the statute does not require the debt to be undisputed and liquidated to allow the trustee to compel turnover. In re Porter-Hayden Co., 304 B.R. 725, 732 (Bankr. D. Md. 2004) (collecting cases); In re Commercial Fin. Servs., 251 B.R. 414, 422-23 (Bankr. N.D. Okla. 2000) (same). Because I conclude that Miller's §542(b) claim fails on other grounds, see Part V.C., infra, I do not reach this issue.

See Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 356 (3d Cir. 2001) ("if the debtor has a claim that is barred at the time of the commencement of the case by the statute of limitations, then the trustee would not be able to pursue that claim, because he too would be barred" (quoting S. Rep. No. 95-989, at 82 (1978))); see also In re Tri-State Telecommunications, Inc., 2012 WL 4904537, at *7 (Bankr. E.D. Pa. Oct. 15, 2012).

## V.  DISCUSSION

### A.  11 U.S.C. §542(a)

In the Amended Complaint, Miller alleged that Jannetta was in possession of up to $130,000.00 in Advances that was property of the Debtor's estate and subject to turnover pursuant to §542(a).

The Companies Loan, alleged to be $126,925.00, was made during the period of February 1989 to 1993.  The evidence established that the Debtor made most of the advances on the Companies Loan directly to the Companies and only in a few instances to Jannetta himself. According to the Ledger, any funds that Jannetta personally received would have been in 1989. Miller presented no other evidence to demonstrate that Jannetta remained in possession of the funds when the bankruptcy case was commenced in May 2010.  As for the $32,095.00 and $3,612.00 advances, other than the amounts, Miller presented no evidence regarding the dates of the advances or that Jannetta was in possession of any of these monies in May 2010.

As the plaintiff, Miller bears the burden of proving all of the elements of his §542(a) claim, including that Jannetta was in possession of the Advances.  Because I find that Miller has failed to meet his burden, I will enter judgment in favor of Jannetta on Miller's §542(a) turnover

claim.

### B. 11 U.S.C. §542(b): the $32,095.00 and $3,612.00 advances

As stated in Part III, the $130,000.00 debt that Miller asserts is mature, payable on demand or on order, as property of the estate is allegedly made up of three (3) sets of advances. If I were to assume that the Companies Loan is $126,925.00,[9] then at least some part of the $32,095.00 or the $3,612.00 advances are being demanded by Miller.

Upon review of the record, I note that the $32,095.00 and $3,612.00 advances were only mentioned in passing at trial. Miller failed to establish even the most basic facts regarding these advances, such as, when the advances occurred, whether they were made pursuant to a written loan agreement, what were the repayment terms, etc.

With only the Debtor's stark assertion that he made advances to or for Jannetta, Miller has not established that Jannetta owed a debt, much less one that was matured and payable to the Debtor's bankruptcy estate. I find that Miller has failed to satisfy his burden under §542(b).

### C. 11 U.S.C. §542(b): the Companies Loan

#### 1. statute of limitations – brief overview

Miller's claim based on the Companies Loan is an action to recover on a contract. In Pennsylvania,[10] the statute of limitations for a breach of contract claim is four (4) years. 42

---

[9] See footnote 3 & accompanying text, supra.

[10] I am assuming Pennsylvania law applies. The parties have not argued to the contrary and have relied upon Pennsylvania precedent in their post-trial submissions.

Pa.C.S. §5525.[11] The limitations period begins to run from the time the cause of action accrues. The cause of action for breach of contract accrues when the contract is breached. E.g, Romeo & Sons, Inc. v. P.C. Yezbak & Sons, Inc., 652 A.2d 830, 832 (Pa. 1995); see also State Farm Mut. Auto. Ins. Co. v. Rosenthal, 2006 WL 166567, at *2 (E.D. Pa. Jan. 20, 1996).

Determining when an alleged breach of a contract has occurred is dependent, of course, on the terms of the contract. It is necessary, therefore, to scrutinize the contract on which Miller seeks to recover. Unfortunately, on the record presented, the terms of the contract between the Debtor and Jannetta are unclear. If the original agreement provided for repayment of the monies the Debtor advanced to Jannetta only when the Companies became profitable and the Companies never became profitable (and never could become profitable, considering that they went "out of business"), did a repayment obligation ever arise?[12] Once the Companies ceased operating in 1994, was the original agreement modified to require repayment when Jannetta's "ship came in," and if so, what did that mean? Notwithstanding the paucity of the record, it is possible to reach certain conclusions regarding the Companies Loan that facilitate an analysis of the statute of limitations issues debated by the parties.

The oral Companies Loan contract potentially can be construed in one (1) of two (2) ways – either as a (1) contract that required Jannetta to perform his repayment obligation when he was "able to pay" or (2) "continuing contract." As explained below, I find it to be the former.

---

[11] The four (4) year limitation period applies to "[a]n action upon an express contract not founded upon an instrument in writing." 42 Pa.C.S. §5525(3).

[12] In his post-trial submission, Jannetta indirectly questioned, or at least did not concede, that an enforceable contract existed. However, he made no express argument that Miller's recovery is barred by the absence of an enforceable contract.

## 2. the "when able to pay" construction of the contract

The construction of the Companies Loan contract that I adopt, is that, in 1994, after the Companies ceased operating, (thereby eliminating any possibility that their profits would trigger Jannetta's repayment obligation), the parties modified their agreement. As modified, Jannetta's repayment obligation would not arise until one (1) of his investments provided a return sufficient to enable him to repay the Debtor. Contracts of this nature, that contain no specified time for repayment other than the time when the borrower is financially able to repay the loan, are sometimes referred to as "when able to pay" contracts. See When Statute of Limitations Commences to Run Against Promise to Pay Debt "When Able," "When Convenient," Or the Like," 67 A.L.R.5th 479 (West 2011).

For an oral, "when able to pay contract," such as the one involved here, the pertinent question is when does the statute of limitations begin to run? Courts have answered this question in two ways: (1) the date of the loan (based on the theory that the obligation is payable on demand and therefore, is a "present debt"); or (2) upon the passage of a reasonable period of time from the date of the loan. See id.; see also When Statute of Limitations Begins to Run Against Action Based on Unwritten Promise to Pay Money Where There Is No Condition or Definite Time for Repayment, 14 A.L.R.4th 1385 (West 2011).

As the court observed in In re Pagnotti, 269 B.R. 326 (Bankr. M.D. Pa. 2001), there are no Pennsylvania appellate decisions precisely on point on this question. In Pagnotti, the bankruptcy court exercised its obligation to predict how the Pennsylvania Supreme Court would rule on the issue, see, e.g., Klein v. Weidner, 729 F.3d 280, 283 (3d Cir. 2013) (citing cases), and held that the statute of limitations begins to run on the date the loan was extended. Pagnotti, 269

B.R. at 334.

Pagnotti is well-reasoned, but I need not decide whether I will follow its holding. Under either the "date of the loan" or the "reasonable period of time" approach, the limitations period expired before the commencement of this bankruptcy case.

Using the "date of the loan" approach, the latest possible date for the commencement of the limitations period was some time in 1993, when the last advance was made, or 1994, when the contract was modified. Under this analysis, the claim obviously was time-barred when the bankruptcy case was filed in 2010. Even if the proper legal standard is that the limitations period did not commence until a reasonable period of time after the date of the loan (again, either 1993 or 1994), I conclude that a twelve (12) or thirteen (13) year time period was not reasonable given the nature of the Debtor's business relationship with Jannetta. Without determining precisely when the limitations period commenced, the clock certainly began to run prior to 2006, a date more than four (4) years before the commencement of the bankruptcy case and 12-13 years after the date of the loan.

### 2. Miller's "continuing contract" argument

In his post-trial brief, Miller asserts that the analysis above misses the mark entirely. He contends that the contract between the Debtor and Jannetta should be construed as a "continuing contract," which requires an entirely different method of determining whether the statute of limitations has run. Based on this premise, he contends that the limitations period has not expired. Respectfully, I disagree.

A continuing contract is "an agreement which does not fix any certain time for payment

or for the termination of the services." Thorpe v. Schoenbrun, 195 A.2d 870, 872 (Pa. Super. Ct. 1963). It arises when the parties' agreement calls for one party to provide services to another for an indefinite duration. See In re Koonce's Estate, 161 A. 578, 579 (Pa. Super. Ct. 1932). "The test of continuity . . . [is] whether the services were performed under one continuous contract, whether express or implied, with no definite time fixed for payment, or were rendered under several separate contracts." Thorpe v. Schoenbrun, 195 A.2d 870, 872 (Pa. Super. Ct. 1963) (quoting 22 P.L.E., Limitation of Actions §56); see also 2 Standard Pennsylvania Practice 2d §13:99 (West 2014) ("A continuing contract is distinguishable from instances where services are performed or payments rendered under several separate contracts, whether express or implied, with no definite time fixed for payment"). A simple example is when a doctor or other healthcare professional provides medical care on a continuing basis. E.g., Thorpe, 195 A.2d 873-74.

For a continuing contract, the statute of limitation does not begin to run until breach occurs or the termination of the contractual relationship between the parties. Cole v. Lawrence, 701 A.2d 987, 989 (Pa. Super. 1997) (citing Thorpe, 195 A.2d at 872)). More specifically, if a continuing contract is one which does not fix a time certain for payment and for termination of services, the statute of limitations begins to run upon termination of the contract. Thorpe, 195 A.2d at 872.

Miller asserts that the Debtor loaned money to Jannetta on a continuing basis and the Debtor expected that Jannetta would repay him the obligation as just one part of a single continuing contract between them that continues to this very day. In support of this notion, he cites the fact that the Debtor still prepares Jannetta's income tax returns. Therefore, according to

Miller, the continuing contract has never terminated, the limitations period has never commenced and the Companies Loan is a valid and existing obligation due and payable to the Debtor's estate.

I am unpersuaded by Miller's characterization of the Debtor-Jannetta contractual relationship.

The first business relationship between the Debtor and Jannetta's was as a lessor and lessee, when Jannetta leased office space from the Debtor in the mid to late 1980's. Over the next decade, the parties became involved in several separate and unrelated business investments. Only scant details of these investments were presented, but from the testimony, the last business investment was roughly around 2002. None of these business deals appear to involve any written agreement between the Debtor and Jannetta. More significantly, nothing in the record suggests that the other investments were a direct outgrowth of or bore any direct relationship to the Companies Loan. Rather, I infer from the sparse testimony, that the Debtor and Jannetta entered into a series of independent, joint investment ventures, each one standing alone, as those distinct opportunities presented themselves. There was no evidence that these transactions were integrated in any way.[13]

---

[13] As for the Companies Loan, standing by itself, it consisted of a series of advances that were made monthly, at least initially, starting in February 1989 and continuing until sometime in 1993. The Debtor testified that he paid most of the Companies Loan advances to the Companies. Accepting as I do, that the Ledger is accurate on this point, it shows that all but two (2) of the payments were made to the Companies. Both parties believed that the investment promised to be lucrative and they tied the repayment of the Companies Loan to the ultimate success of the venture. However, the Companies were abandoned in 1994.

While Miller does not make this precise argument, from the facts, it may be fair to conclude that the Companies Loan, by itself, was a continuing contract. But, even if it were (as opposed to a "when able to pay" contract, as I have found), the contract terminated in 1994 when the Companies ceased operating and no further advances were made by the Debtor on Jannetta's behalf for the Companies, and the limitations period commenced at that time.

I decline to conceptualize all of the joint investment ventures as part of a single continuing contractual relationship. The last investment was made in 2002 and any continuing contract involving ongoing joint business investment ventures terminated at that time. If the limitations period commenced some time in 2002, it expired well in advance of the Debtor's 2010 bankruptcy filing.

To avoid this outcome, Miller posits that the continuing contract remained extant even after the last investment in 2002 because the Debtor employed Jannetta's accounting and tax services more than a decade later. I disagree. The accountant/client relationship between the Debtor and Jannetta differs materially from the loan/investment relationship that existed between them previously.

The record is undeveloped regarding the accountant/client relationship between the Debtor and Jannetta. I know neither how long the Debtor served as Jannetta's accountant nor the scope of the services provided; I know only that he has prepared Jannetta's tax returns after the Debtor's case was filed. Nor is there anything in the record suggesting that the parties viewed the two (2) relationships (loan/investment and accountant/client) as related in any way. As a factual matter, Miller has not met his burden of proof.

On this record, it would be an unprecedented expansion of the continuing contract doctrine to hold that the parties' contractual relationship continued for more than twenty (20) years based on what appear to be no more than ad hoc, unrelated business relationships. In short, the business investments were separate transactions and agreements, distinguishable from the accounting services that the Debtor later provided to Jannetta.

For these reasons, I conclude that the "continuing contract" theory is flawed and does not

bar the application of the statute of limitations to Miller's claim.

### 3. the acknowledgment doctrine

Miller has one (1) final bow in his quiver. He asserts that limitations period has not expired under the "acknowledgment doctrine."

Pennsylvania law has long recognized the acknowledgment doctrine, which provides that a statute of limitations may be tolled or its bar removed by a promise to pay the debt. Makozy v. Makozy, 874 A.2d 1160, (Pa. Super. Ct. 2005). For instance, payment on a debt is an affirmative acknowledgment of the debt. United States v. Hemmons, 774 F. Supp. 346, 351 (E.D. Pa. 1991) ("Under Pennsylvania law . . . a loan payment serves as an acknowledgment of the total outstanding debt, the statute of limitations re-commences running with each payment."); Huntingdon Fin. Corp. v. Newtown Artesian Water Co., 659 A.2d 1052, 1053 (Pa. Super. Ct. 1995) ("There can be no more clear and unequivocal acknowledgment of debt than actual payment").

In the absence of payment, the obligor's communication of his or her acknowledgment of the debt can serve to re-boot the limitations period:

> A **clear, distinct and unequivocal acknowledgment** of a debt as an existing obligation, such as is consistent with a promise to pay, is sufficient to toll the statute. There must, however, be **no uncertainty** either in the acknowledgment or in the identification of the debt; and the acknowledgment must be plainly referable to the very debt upon which the action is based; and also must be **consistent with a promise to pay on demand** and not accompanied by other expressions indicating a mere willingness to pay at a future time. A simple declaration of an intention to discharge an obligation is not the equivalent of a promise to pay, but is more in the nature of a desire to do so, from which there is no implication of a promise.

Newtown Artesian Water Co., 659 A.2d at 1054 (quoting Maniatakis' Estate, 101 A. 920, 921

(Pa. 1917)) (emphasis added).

Pennsylvania courts have insisted that an acknowledgment be unequivocal and unqualified. Hazlett v. Stillwagen, 1903 WL 3164, at *2-3 (Pa. Super. Ct. 1903) ("the acknowledgment must be unaccompanied by any conditions or qualifications inconsistent with an absolute promise to pay generally or on demand"). A hope or desire to pay in the future is not indicative of a promise to pay and will not toll the statute of limitations. Fix's Estate, 140 Pa. Super. 60, 63 (Pa. Super. Ct. 1940). Even an apparently unqualified statement in isolation may be rebutted by statements that refute an intention to pay the obligation on demand. Hazlett, 1903 WL 3164, at *3. Pennsylvania case law also strictly applies the requirement that the acknowledged debt be clearly identified. See Raab v. Lander, 427 Fed. App'x. 182, 187 (3d Cir. 2011) (non-precedential) (referring to "strict requirements" for acknowledgment doctrine to apply under Pennsylvania law).[14]

For several reasons, I conclude that the October 20, 2010 e-mail is not an acknowledgment of the Companies Loan debt.

First, the October 20, 2010 e-mail does not clearly define the obligation to which Jannetta refers. The October 20, 2010 e-mail's subject was: "Money owed -- Jannetta." In the body of the e-mail, Jannetta referred to a conversation he had with the Debtor "about . . . leaving the office," and stated that he thought the amount owed was around $70,000.00. (Ex. P-3). Jannetta

---

[14] For example, in McPhilomy v. Lister, 19 A.2d 143 (Pa. 1941), the court found the standard unsatisfied where the evidence at trial established that the defendant paid money to the plaintiff by check on account of a debt. The court held that the payment gave rise to an inference of a prior indebtedness to the plaintiff, but even when combined with evidence that defendant owed the plaintiff money, these facts did not amount to an acknowledgment. Id. at 145. Without identification of the exact indebtedness or its amount, the court found the evidence fell short of the standard required. Id.

in no way referred to the Companies Loan which the Debtor made on his behalf for the Companies.

Jannetta testified that he and the Debtor spoke about the $130,000.00 obligation shortly before Jannetta sent the October 20, 2010 e-mail. This testimony may give rise to an inference that Jannetta was talking about the Advances in his October 20, 2010 e-mail. See Hazlett, 23 Pa. Super. at 117-18 (circumstantial evidence may establish particular debt with sufficient certainty). However, other facts cloud that inference. In the e-mail, Jannetta stated that the amount was "somewhere around" $70,000.00. This amount does not coincide with the $126,925.00 Companies Loan, nor does it appear to correspond to any other particular obligation that was alleged to be owed to the Debtor. The Debtor's trial testimony established that he believed that Jannetta owed him for various other debts, inter alia, office services, unpaid rent, and other amounts advanced over the years. (N.T. 38-40). According to the Debtor, these debts were allegedly owed by either Jannetta personally or by one of his companies.

In these circumstances, the obligation to which Jannetta referred in the October 20, 2010 e-mail is not sufficiently clear or distinct to permit invocation of the acknowledgment doctrine. See McPhilomy, 19 A.2d at 145 ("identification by mere inference of the [factfinder] from other collateral matters is not sufficient" (quoting Rosencrance v. Johnson, 43 A. 360, 361 (Pa. 1899))).

Second, Jannetta's statement in the October 20, 2010 e-mail was conditional: "I **hope** to pay you when Yaupon gets sold." (Ex. P-3) (emphasis added). This qualified statement was not the equivalent of an unconditional promise to pay. Jannetta did not promise to pay on demand, but rather expressed only a willingness to pay in the future dependent upon the occurrence of the

sale of an investment.  E.g., Garland Co. v. J.L. Miller & Sons, Inc., 395 Pa. Super. 532, 535 (Pa. Super. Ct. 1990) ("any words inconsistent with a promise to pay will make the acknowledgment inoperative"); Fix's Estate, 140 Pa. Super. at 63-64 ("a desire, an intention or a hope of ability to pay in the future" is equivocal, indeterminate, and insufficient to toll the statute of limitations).

Finally, Jannetta testified he did not believe he owed any money at the time the Debtor demanded repayment on the Advances and thought that he could negotiate a more reasonable number with the Debtor at a later time.  Jannetta's testimony is consistent with a finding that the October 20, 2010 e-mail was not an unconditional admission of liability or promise to pay.

### VI.  CONCLUSION

For the reasons set forth above, I find that the statute of limitations has expired on Miller's claim against Jannetta.[15]  Judgment will be entered in favor of Defendant Jannetta and against Plaintiff  Miller.

**Date: April 15, 2014**

**ERIC L. FRANK
CHIEF U.S. BANKRUPTCY JUDGE**

---

[15]    Miller also asserted a claim for unjust enrichment.  A claim for unjust enrichment is quasi-contractual and does not lie when the parties entered into an express contract.  See Salvino Steel & Iron Works, Inc. v. Fletcher & Sons, Inc., 580 A.2d 853, 856-57 (Pa. Super. Ct. 1990).  Here, I have found, albeit on a minimal record, that there was an express, oral contract between the Debtor and Jannetta.  Consequently, Miller may not recover for unjust enrichment.